2018R01264/BJC

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 19-693 (BRM) |
| | : | |
| v. | : | Hon. Brian R. Martinotti |
| | : | |
| JEFFREY TAMULSKI | : | 18 U.S.C. § 371 |

## S U P E R S E D I N G   I N F O R M A T I O N

The defendant having waived in open court prosecution by indictment, the Attorney for the United States for the District of New Jersey acting under the authority of 28 U.S.C. § 515 charges:

### (Conspiracy to Violate the Anti-Kickback Statute)

1.     Unless otherwise indicated, at all times relevant to this Superseding Information:

### The Defendant and Ark Laboratory Network LLC

a.     Defendant JEFFREY TAMULSKI ("defendant TAMULSKI") resided in Tampa, Florida.

b.     Ark Laboratory Network LLC ("Ark") was a Florida limited liability company that purported to operate a nationwide network of laboratories and laboratory partners that facilitated genetic testing. Ark's primary business premises was co-conspirator Edward B. Kostishion's ("co-conspirator Kostishion") residence in Lakeland, Florida. In addition to co-conspirator Kostishion, co-conspirator Jeremy Richey ("co-conspirator Richey") and co-conspirator Kacey C. Plaisance ("co-conspirator Plaisance") co-owned and managed Ark.

c.    Through Ark, defendant TAMULSKI and co-conspirators Kostishion, Plaisance, Richey, and others submitted or caused to be submitted referrals for genetic tests and patients' DNA samples to various clinical laboratories across the country. The laboratories paid defendant TAMULSKI and Ark in exchange for these referrals on a per-sample basis or based on the revenue the laboratories received from insurance companies and government health care programs.

### Background on the Medicare Program and Genetic Testing

d.    Medicare was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare was a "health care program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f). Individuals who received benefits under Medicare were commonly referred to as "beneficiaries."

e.    The Medicare Part B program was a federally funded supplemental insurance program that provided Medicare insurance benefits for individuals aged 65 or older, and for certain individuals who were disabled. The Medicare Part B program paid for various medical services for beneficiaries, including diagnostic genetic tests.

f.    Genetic tests were laboratory tests designed to identify specific inherited mutations in a patient's genes. These genetic variations affected

2

a patient's risk of developing certain diseases or how the patient responded to medications.

g.    Genetic tests related to a patient's hereditary predisposition for cancer were commonly referred to as "CGx" tests. Pharmacogenomic genetic tests related to identifying how a patient's genes affect the patient's response to drugs were commonly referred to as "PGx" tests.

h.    To conduct a genetic test, a laboratory must obtain a DNA sample from the patient. Such samples were typically obtained from the patient's saliva by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile. The DNA sample was then submitted to the laboratory for analysis, such as CGx or PGx.

i.    If the patient had insurance, the laboratory would typically submit a claim for reimbursement for the test to the patient's insurance carrier. Reimbursement rates for CGx tests may have exceeded $10,000 per test, while reimbursement rates for PGx may have exceeded $6,500 per test.

j.    Medicare excluded from coverage diagnostic genetic tests "that are not reasonable and necessary . . . [f]or the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 411.15(k)(1). To be considered "reasonable and necessary," Medicare rules required that genetic testing "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the

management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a).
"Tests not ordered by the physician who is treating the beneficiary are not
reasonable and necessary." *Id.*

      k.    Non-physician practitioners, such as clinical nurse specialists
or physicians assistants, may also order genetic tests but were subject to the same
requirement as physicians: they must consult or treat the beneficiary for a specific
medical problem and use the test results to manage the beneficiary's specific
medical problem. 42 C.F.R. § 410.32(a)(2).

### The Clinical Laboratories

      l.    The "DNA Labs" were clinical laboratories that performed
genetic testing and submitted claims to Medicare, including:

          i.    Metric Lab Services, LLC ("Metric Lab"), a clinical
laboratory located in Mississippi owned by Sherman Kennerson ("Kennerson"),
Jeffrey Madison ("Madison"), and others;

          ii.    "Laboratory 1," a clinical laboratory located in New
Jersey; and

          iii.    "Laboratory 2," a clinical laboratory located in Texas.

      m.    Each of the DNA Labs entered into separate agreements with
Ark under which the DNA Labs paid Ark in exchange for genetic test referrals
and DNA samples that Ark submitted or caused to be submitted to the DNA Labs.

n.  From in or about January 2018 to in or about January 2019, the DNA Labs billed Medicare over approximately $13 million in connection with genetic tests that Ark referred or caused to be referred to the DNA Labs.

o.  From in or about January 2018 to in or about January 2019, Medicare paid the DNA Labs at least approximately $4.6 million for genetic tests that Ark referred or caused to be referred to the DNA Labs.

p.  In turn, from in or about May 2018 to in or about January 2019, the DNA Labs paid Ark at least $1.8 million in exchange for the genetic test referrals that Ark delivered to the DNA Labs.

## **The Conspiracy**

2.  From in or about 2017 through in or about September 2019, in the District of New Jersey and elsewhere, defendant

### **JEFFREY TAMULSKI**

did knowingly and intentionally conspire and agree with co-conspirators Kostishion, Plaisance, Richey, and others to commit certain offenses against the United States, that is, to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in exchange for referring an individual to a person for the furnishing and arranging for the furnishing of items and services for which payment was made in whole and in part under a Federal health care program, namely, Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A).

## Goal of the Conspiracy

3.      The goal of the conspiracy was to unlawfully solicit and receive kickbacks and bribes for defendant TAMULSKI, co-conspirators Kostishion, Plaisance, Richey, and others.

## Manner and Means of the Conspiracy

4.      The manner and means by which defendant TAMULSKI, co-conspirators Kostishion, Plaisance, Richey, and others sought to accomplish the goal of the conspiracy, included, among other things, the following:

a.      Ark entered into sham agreements with clinical laboratories including Metric, Laboratory 1, and Laboratory 2 (the "Three DNA Labs") under which Ark offered to provide various consulting, marketing, and other services (the "Sham Agreements") in exchange for charging the Three DNA Labs an hourly basis and rate for Ark's services.

b.      In reality, the Three DNA Labs paid Ark in exchange for referrals based on the revenue that the Three DNA Labs received from federal health care programs.

c.      Specifically, defendant TAMULSKI, co-conspirators Kostishion, Plaisance, and/or Richey generally agreed with each of the Three DNA Labs that each laboratory would determine the amount of kickbacks and bribes paid to defendant TAMULSKI and Ark based on the following formula (the "Kickback and Bribe Formula"): (i) calculating the amount of Medicare revenue that the laboratory received as a result of genetic tests that Ark referred to the

laboratory; (ii) deducting a negotiated costs of goods sold ("COGS") amount that the laboratory incurred in connection with the tests and, in some cases, a billing fee; and (iii) paying defendant TAMULSKI and Ark a percentage of the remaining profit.

        d.      The Three DNA Labs, defendant TAMULSKI, and Ark made efforts to track: (i) the amounts paid as kickbacks and bribes to defendant TAMULSKI and Ark; (ii) the genetic tests that defendant TAMULSKI and Ark referred or caused to be referred; and (iii) the revenue that these genetic tests generated for each of the Three DNA Labs.

        e.      To conceal the solicitation and receipt of kickbacks and bribes from the Three DNA Labs, defendant TAMULSKI, co-conspirators Kostishion, Plaisance, and Richey drafted, submitted, and facilitated the submission of sham Ark invoices to the Three DNA Labs based on hourly services and rates.

        f.      Specifically, Ark submitted invoices for hourly services to conceal the fact that the Three DNA Labs, defendant TAMULSKI, co-conspirators Kostishion, Plaisance, and others, had already determined and agreed upon the amount that each of the Three DNA Labs would pay Ark based on the Kickback and Bribe Formula in exchange for referring and arranging for referrals of genetic tests for Medicare beneficiaries to the Three DNA Labs.

        g.      From in or about January 2018 to in or about January 2019, Medicare paid the Three DNA Labs over $480,000 for genetic tests that Ark referred or caused to be referred to the Three DNA Labs.

h.    In turn, from in or about May 2018 to in or about January 2019, the Three DNA Labs paid Ark over $250,000 in exchange for the genetic test referrals that Ark delivered to the DNA Labs.

## Overt Acts

5.    In furtherance of the conspiracy, and to effect its goal, defendant TAMULSKI, co-conspirators Kostishion, Plaisance, Richey, and others committed or caused the commission of the following acts in the District of New Jersey and elsewhere:

a.    In or about August 2018, Metric Lab agreed to pay defendant TAMULSKI 15% and Ark 45% of the total revenue collected in connection with genetic test referrals that Ark delivered to Metric Lab, after deductions for COGS and a billing fee.

b.    On or about August 17, 2018, an employee from Metric Lab emailed defendant TAMULSKI and two owners of Metric Lab, Kennerson and Madison, the calculation pursuant to the Kickback and Bribe Formula and the corresponding amounts owed to defendant TAMULSKI and Ark, which resulted in "payouts" of approximately $28,853.93 to defendant TAMULSKI and approximately $86,561.79 to Ark.

c.    On or about August 20, 2018, co-conspirator Kostishion emailed Kennerson and Madison, copying co-conspirators Plaisance and Richey, an Ark invoice for August 1 through August 15, 2018, in the amount of $86,562.00 (the "First August Ark Invoice"), which merely rounded up to the next dollar the

same amount—$86,561.79—that Metric Lab had already calculated under the Kickback and Bribe Formula. This sham invoice purported to describe approximately 346.25 hours of certain services that Ark provided at an hourly rate of $250 per hour, but was really calculated pursuant to the Kickback and Bribe Formula and not any *bona fide* services.

      d.    On or about August 21, 2018, defendant TAMULSKI sent a text message to co-conspirator Kostishion stating that Madison "asked if you could update your invoice. They want hours in total (ie 120 hours instead of 40/3) He suggested breaking it up like 118.5 (etc …)."

      e.    Consistent with defendant TAMULSKI's text message instruction, on or about August 21, 2018, co-conspirator Kostishion emailed a revised Ark invoice for August 1 through August 15, 2018, for the same amount of $86,562.00 (the "Second August Ark Invoice") "as per your request" to Kennerson and Madison, copying co-conspirators Plaisance and Richey. As with the First August Ark Invoice, this sham invoice also purported to describe the same services that Ark provided at an hourly rate of $250 per hour but, instead of providing increments such as "40.0 /4," simply totaled the hours performed in each category. As with the first invoice, this invoice also was calculated pursuant to the Kickback and Bribe Formula and not any *bona fide* services.

      f.    On or about August 21, 2018, co-conspirator Kostishion engaged in a text message exchange with Kennerson and Madison in which co-

conspirator Kostishion informed them that he "just resent . . . the updated invoices as per your request, please process the wire accordingly[.]"

    g. From on or about August 6, 2018, through on or about January 10, 2019, Metric Lab paid Ark approximately $136,000.

   In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

1.    The allegations contained in this Information are realleged here for the purpose of alleging forfeiture, pursuant to 18 U.S.C. § 982(a)(7).

2.    Upon conviction of the conspiracy offense alleged in this Information, defendant TAMULSKI shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, he obtained that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the conspiracy to solicit and receive kickbacks and bribes, contrary to 42 U.S.C. § 1320a-7b(b)(1)(A), in violation of 18 U.S.C. § 371.

## SUBSTITUTE ASSETS PROVISION
### (Applicable to All Forfeiture Allegations)

3.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)), to forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

_____
VIKAS KHANNA
Attorney for the United States
Acting under the
Authority of 28 U.S.C. § 515